## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **ALLEGIANT AIR, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Civil Action No. 1:23-cv-01498-RP** |
| | § | |
| **LONESTAR AIRPORT HOLDINGS,** | § | |
| **LLC,** | § | |
| | § | |
| **Defendant.** | | |

### PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Allegiant Air, LLC ("Allegiant") hereby complains of Defendant Lonestar Airport Holdings, LLC ("Lonestar") as follows:

### PARTIES

1.      Allegiant is a Nevada limited liability company.

2.      Lonestar is a Delaware limited liability company that was served with process through its registered agent, Kimberly Dorrien, in Austin, Texas.

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction because this case involves parties of diverse citizenship and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

4.      This Court has personal jurisdiction over Lonestar because it has made an appearance in this action. This Court also has personal jurisdiction over Lonestar because all of Allegiant's claims arise out of and are directly related to Lonestar's actions within Texas, namely Lonestar's actions as operator of the South Terminal at the Austin Airport. Furthermore, Lonestar purposefully availed itself of the benefits and protections of Texas law by operating the South Terminal at the Austin Airport.

5.      Venue is proper in the United States District Court for the Western District of Texas, Austin Division, because it is a judicial district where Lonestar resides for venue purposes. 28 U.S.C. § 1391(b)(1), (c)(2).  Venue is also proper in the Western District of Texas, Austin Division, because it is the judicial district in which a substantial part, if not all, of the events or omissions giving rise to the claims occurred.  28 U.S.C. § 1391(b)(2).

## FACTS

6.      Founded in 1997, Allegiant is a major air carrier offering affordable and convenient scheduled and charter flights throughout the United States.  Allegiant began operating at Austin-Bergstrom International Airport (the "Airport") in October of 2013 with service from Austin to Las Vegas.  Since establishing service at the Airport, Allegiant has flown more than 1.87 million passengers through Austin.

**A.      Allegiant Subleased South Terminal Space from Lonestar.**

7.      The City of Austin (the "City") leased the South Terminal at the Airport to Lonestar under a 40-year lease, which was not set to expire until 2056.  On April 13, 2017, Allegiant became the first airline to begin operating out of the South Terminal.

8.      The Airline Operating Agreement for South Terminal between the City and Allegiant (the "Operating Agreement") expressly contemplated that Allegiant would "lease or sublease" South Terminal space from Lonestar.  The Operating Agreement grants many rights to Allegiant that it enjoys today, which pursuant to the Operating Agreement, are rights granted "subject to [Allegiant] having leased, or subleased, appropriate terminal or other space at the Airport under a separate agreement."

9.      On April 1, 2018, Allegiant formally began subleasing South Terminal space from Lonestar pursuant to a series of agreements with Lonestar (the "Sublease").  The Sublease provided Allegiant with the right to exclusive use of certain interior and exterior space at the South Terminal.

It also provided Allegiant with the right to common use of other areas at the South Terminal. In exchange for these rights of exclusive and common use at the South Terminal, Allegiant agreed to pay Lonestar certain monthly fees and charges (the "Terminal Fees").

10.     The Sublease provided that Allegiant shall, upon payment of Terminal Fees, peaceably have and enjoy the rights and uses of the South Terminal provided by the Sublease. It was understood among the parties that the Sublease would be continually renewed so that Allegiant could continue to operate out of the South Terminal as Lonestar's original and key tenant.

**B.     Allegiant Expands its Operations in Austin and Agrees to Construct Base Support Facility on Land Identified by Lonestar as Within its "Existing Leasehold Area."**

11.     Allegiant steadily expanded its operations in Austin over the years. In early 2021, Allegiant even decided to establish Austin as a new "Base of Operations," which would require substantial investment from Allegiant to build necessary infrastructure and relocate a significant amount of personnel.

12.     As part of establishing the new Base of Operations, Allegiant needed to invest in constructing certain base support facilities (the "Facility") at the South Terminal. In or around February 2021, Allegiant began discussions with Lonestar regarding the logistics of where to place the Facility and how to pay for it.

13.     As part of these discussions, on February 5, 2021, Lonestar's CEO Jeff Pearse sent Allegiant representatives a document containing a map of the South Terminal with yellow lines demarcating the boundaries of what Lonestar represented was its "Existing Leasehold Area:"



14.     Lonestar proposed that the Facility should be constructed on the rectangular area located at the very left edge of map, which was enclosed within the yellow lines.

15.     Based on these material representations, and at Lonestar's urging, Allegiant agreed that the Facility could be constructed on the area located within the "Existing Leasehold Area" as represented by Lonestar.

16.     Allegiant and Lonestar also agreed on several essential and material terms relating to construction of the Facility (the "Agreement").  Lonestar promised to select the contractors and pay the up-front costs of construction for the Facility.  In turn, Allegiant agreed to subsequently reimburse Lonestar in full for those costs of construction.  Following payment, Lonestar promised to transfer ownership of the Facility to Allegiant.

17.     Following the Agreement, Lonestar began receiving invoices from contractors as

early as June of 2021 relating to construction of the Facility, as shown on its own Transaction Report provided to Allegiant representatives.

**C.    Lonestar Enters License Agreement with the City Covering the Land Upon Which Lonestar Built Allegiant's Facility.**

18.    On August 1, 2021, after the Agreement was entered and after construction of the Facility had already begun, Lonestar entered into a License Agreement with the City.

19.    As part of the License Agreement, the City purported to license to Lonestar the right to use the Licensed Area, which was identified as the very same area that Lonestar represented to Allegiant was part of its "Existing Leasehold Area."

20.    Allegiant was not a party to nor invited to the negotiation surrounding the License Agreement.

**D.    Lonestar Proposes Five-Year Sublease and Then Abruptly Revokes It in Favor of One-Year Sublease.**

21.    In or around November 2021, Lonestar and Allegiant began negotiations for a longer five-year Sublease, which would expire December 31, 2026.

22.    In fact, on December 8, 2021, Lonestar's CEO Jeff Pearse sent Allegiant a partially executed Sublease that contained the expiration date of December 31, 2026.

23.    A major component of the five-year deal was that Allegiant was to repay Lonestar the costs of construction of the Facility spread out pro rata over the five-year term.

24.    However, on January 13, 2022, Lonestar's CEO Jeff Pearse abruptly revoked the five-year deal from consideration and replaced it with a one-year deal.  As part of the one-year "take it or leave it" agreement, Lonestar demanded that Allegiant immediately pay the construction costs relating to the Facility upon receipt of invoices from Lonestar.

25.    Lacking other options, Allegiant reluctantly agreed to a new one-year term with Lonestar effective January 1, 2022.

26.     The new Sublease contained a more detailed description of Allegiant's Exclusive and Common Use Exterior Space at the South Terminal:

Terminal Premises (Exclusive Use Space and Common Use Space) - Exterior



**Exterior Operational Support Space includes:**

- Maintenance Office Modular Unit – 320 square feet
- Temporary Maintenance & Commissary Storage (Fabric/Tent Structure – 2,178 square feet
- Permanent Maintenance & Commissary Storage (PEMB) – 3,185 square feet
- Ground-Handling Office G4 Manager's Office and Crew Break Room – 1,500 square feet
- Vehicle and GSE Parking – 1,500 square feet
- Ice Storage

    **Total Exterior Support Space - 8,683 square feet**

27.     Thus, pursuant to the Sublease, Allegiant's Exterior Operational Support Space included not only the Facility (also known as the Permanent Maintenance & Commissary Storage (PEMB)), but also a Maintenance Office Modular Unit and a Temporary Maintenance & Commissary Storage (also referred to as the Tent), which was used while construction was ongoing.

**E.     Lonestar Lies to Allegiant Regarding the Land upon Which the Facility Sits.**

28.     Even after the License Agreement was executed, Lonestar continued to represent

to Allegiant that the Facility was sitting on Lonestar's leasehold.

29.     Specifically, on January 5, 2022, Lonestar's CEO Jeff Pearse emailed an Allegiant representative attaching a "brief [he] provided to [Allegiant] back in April 2021 regarding base facility development." Pearse represented to Allegiant that "[s]ome minor changes have been made since then but the big picture elements remain." The brief that Pearse attached to the email again showed the land where the Facility was built as being within Lonestar's "existing leasehold area." Pearse made no mention of the effect of the License Agreement between the City and Lonestar.

30.     Given these continued false representations, Allegiant signed a Construction Cost Recovery Agreement on February 18, 2022, which memorialized one aspect of the Agreement between the parties, namely, Allegiant's reimbursement obligation under the Agreement.

31.     After the Construction Cost Recovery Agreement was signed, Lonestar's CFO Brooke Bilger Dorrien doubled down on Jeff Pearse's misrepresentations. Specifically, on March 30, 2022, Lonestar's CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement." This representation was knowingly false when made.

32.     Within the same email correspondence, Lonestar's CFO Brooke Bilger Dorrien also represented that, in the event of a condemnation, Allegiant would never be required to dismantle or dispose of the Facility. This statement was also knowingly false when made.

**F.    Allegiant Reimburses Lonestar $1,678,390.94 for the Facility.**

33.     On June 30, 2022, after Lonestar's continued and numerous misrepresentations that the Facility sat on leasehold land, Allegiant made its first payment of $932,751.42 to Lonestar. Allegiant made a second payment of $147,131.46 to Lonestar on July 20, 2022.

34.     Allegiant made its final payment of $598,508.06 on April 3, 2023 under protest.

By this time, the condemnation hearing discussed below had been completed and the commissioners had issued their award.

35.    Accordingly, Allegiant paid a total of $1,678,390.94 to construct the Facility pursuant to the Agreement and in reliance on Lonestar's repeated misrepresentations that it was built upon Lonestar's "Existing Leasehold Area."

## G.    The City Initiates the Condemnation Proceeding to Ultimately Demolish the South Terminal.

36.    Meanwhile, on June 17, 2022, the City initiated its Petition for Condemnation against Lonestar and Texas Capital Bank to condemn Lonestar's "leasehold interest in the land, improvements, and all other buildings therein and thereon" (collectively, the "Condemned Property"). Allegiant was not joined in the action despite its Sublease and ownership interest in the Facility.

37.    On February 1-3, 2023, a panel of three Special Commissioners heard evidence on damages caused by the condemnation at a three-day hearing at the offices of counsel for the City.

38.    Lonestar did not offer to allow Allegiant to participate in or observe the hearing. Lonestar did not even give notice to Allegiant that the hearing was taking place.

## H.    Lonestar Represents to Allegiant that the Facility Was Not Considered During the Hearing and Refuses to Give Allegiant Access to the Transcript.

39.    On February 6, 2023, the Special Commissioners awarded Lonestar $90,000,000 as damages caused by the City's taking. Lonestar represented to Allegiant that the Facility was not discussed during the hearing and that it was not considered as part of the Special Commissioners' Award. Specifically, Lonestar's counsel wrote to Allegiant on April 12, 2023 stating that Allegiant's "building was not discussed at, was not valued during, and is not part of the condemnation proceeding."

40.    Despite requests, Lonestar refused to give Allegiant a copy of the transcript from

the hearing. With no access to information, on May 19, 2023, Allegiant initiated a public information request with the City to obtain a copy of this **public document**. After numerous delays and requests for clarifications, the City's counsel finally emailed a copy of the transcript to Allegiant's counsel on June 5, 2023.

41.     A review of the transcript from the hearing revealed that Allegiant's Facility was in fact considered by the Commissioners, contrary to the assertions made by Lonestar's counsel. Specifically, Lonestar's CEO Jeff Pearse testified extensively about Allegiant's role in the development and expansion of the South Terminal:

> **Q. And has Allegiant's presence in Austin grown during their time at the South Terminal?**
>
> A. Substantially. They had, again, limited capability to grow in the Austin market before they moved to the South Terminal. And when they did, I would say in April -- by April they came over and probably had four markets. They announced four new markets, up from one.
>
> They went from 6 departures per week to 18 or 19. And shortly thereafter, I want to say by the fall of 2017, they were operating to 9 markets, growing shortly thereafter to 11 and had anywhere between, depending on the time of the year and so forth, they're very focused on seasonality, 30 – 25 to 30 weekly departures. So Allegiant really capitalized on the capacity that LoneStar was able to create for the City of Austin at the South Terminal.

Transcript, Day 2, 270:9-25.

42.     He further testified to Allegiant's significant investment in establishing Austin as a Base of Operations:

> **Q. Did there come a time when Allegiant announced that it wanted to use the South Terminal as a, quote, "base"?**
>
> A. Yes. Actually, during COVID, believe it or not, 2021, January, I got a call from the corporate real estate folks at Allegiant, and they were excited to share confidential information that they intended to establish Austin, Texas, at ABIA and the South Terminal -- established a base of operations. And what that basically means is they identify or position three aircraft in Austin, and that would be their home base, and they would use those three aircraft every day to connect various cities to and from Austin, and then those planes would return each night. And with

that came over 100 staff members that relocated: Pilots, cockpit crew, cabin crew, maintenance. So it was a big commitment for an airline, particularly, an airline like Allegiant.

Transcript, Day 2, 271:1-18.

43.    Finally, on the last day of the hearing, one of the commissioners specifically questioned Lonestar's CEO Jeff Pearse as to the cost of improvements Lonestar made to the South Terminal, **including the cost of building the Facility for Allegiant:**

**BY COMMISSIONER FRITZ:**

**Q. Real quick. For very good reason, you were very proud that you did your improvements -- when you first got the lease, you did all your improvements in seven months. At a capital cost, which I failed to record, do you remember roughly?**

A. Yeah, it was somewhere in the neighborhood of 12 to 14 million.

**Q. And since then, have you done significant improvements?**

A. We have.

**Q. Can you give me a ballpark on that?**

A. Would you like to hear the projects or the dollar amount?

**Q. The dollar amount.**

A. I would say somewhere between 2 and 4 million, and then another million and a half on behalf of Allegiant Air. We have facilities for their exclusive use, which they'll actually, in time, reimburse us for.

**Q. Through revenue?**

A. Separate agreement. Like, you know, we fronted the money for them.

Transcript, Day 3, 64:17 – 65:14.

**I.    Lonestar Offers Allegiant an Illusory Quitclaim Deed to Transfer the Facility.**

44.    As mentioned, under the Agreement, Lonestar was obligated to transfer ownership of the Facility to Allegiant following Allegiant's reimbursement of the costs of construction.

**AMENDED COMPLAINT**                                                                 **PAGE 10**
ACTIVE 692219892v2

45.     Allegiant made its final payment on April 3, 2023.  However, Lonestar has failed and refused to provide good and marketable title to the Facility in breach of the Agreement.

46.     On May 19, 2023, Lonestar's CEO Jeff Pearse emailed a proposed illusory Quitclaim Deed "to formally transfer" the Facility to Allegiant.

47.     Throughout the parties' entire relationship, this was the first mention of a "Quitclaim Deed" to transfer ownership of the Facility.

48.     Since a quitclaim deed provides no warranty of title whatsoever and transfers only the interest owned by the grantor (if any), Allegiant has refused to accept the illusory Quitclaim Deed offered by Lonestar.

**J.     Allegiant Has Suffered Significant Harm as a result of Lonestar's Wrongful Actions.**

49.     On June 1, 2023, the City announced a settlement with Lonestar in the amount of $88,000,000.

50.     The City has taken the position that it need not compensate Allegiant for the Facility at all because the Facility sits on licensed land as opposed to Lonestar's leasehold.

51.     An appraisal report prepared by the City's expert shows that Lonestar's representation of its "Existing Leasehold Area" is completely at odds with the City's report: [1]

---

[1] Lonestar submitted the City's Appraisal as part of an exhibit to its Complaint against the City in the Western District of Texas, Austin Division, Civil Action No. 1:22-cv-00770.

*Allen, Williford & Seale, Inc.*

**AERIALS AND SUBJECT PHOTOGRAPHS**



Subject Leasehold Property is outlined in Yellow and Green

Aerial Photograph obtained from Google Earth
Randy L. Seale, MAI

Notably, the property upon which the Facility is located is not included within the initial leasehold area or the additional leasehold areas added later by amendment.

52.     As part of the City's Airport Expansion and Development Program, it will demolish the South Terminal, including the buildings located thereon, which includes Allegiant's Facility.

53.     As part of the condemnation proceeding, the City has purported to take Lonestar's leasehold, which necessarily includes Allegiant's Sublease as well.

54.     Lonestar misrepresented to Allegiant that the Facility was being constructed on the

"Existing Leasehold Area," even though it knew that assertion was false when made.

55.     Lonestar entered into the License Agreement with the City yet continued to misrepresent to Allegiant that the Facility sat on leased land.

56.     Lonestar misrepresented to Allegiant that it would not be required to dismantle or dispose of the Facility in the event of a condemnation.

57.     Lonestar refused to give notice to Allegiant to allow it to participate in the proceedings in probate court.

58.     Lonestar refused to give Allegiant a copy of the transcript from the hearing, forcing Allegiant to obtain a copy by resorting to a public information request.

59.     Consistent with Lonestar's efforts to "hide the ball" from Allegiant throughout their entire relationship, Lonestar's counsel has threatened sanctions based on the alleged existence of certain emails that she claims disproves Allegiant's claims, yet she refuses to produce those very emails to Allegiant's counsel despite repeated requests.

60.     Through the wrongful actions described above, Allegiant has been significantly harmed.

61.     All conditions precedent to Allegiant's recovery and Lonestar's liability have occurred, have been performed, or have been waived.

## COUNT ONE: BREACH OF CONTRACT

62.     The Agreement is a valid and enforceable contract.

63.     Allegiant is a proper party to bring suit for breach of contract because it is a party to the Agreement.

64.     Allegiant performed, tendered performance of, or was excused from performing its contractual obligations under the Agreement.

65.     Pursuant to the terms of the Agreement, Lonestar agreed to transfer ownership of

the Facility to Allegiant following Allegiant's reimbursement for the costs of construction of the Facility.

66.     Lonestar materially breached the Agreement by failing and refusing to transfer ownership of the Facility to Allegiant and otherwise provide good and marketable title to the Facility.  Lonestar failed and refused to even warrant that it owns the complete Facility or that it has no clouds or encumbrances.

67.     As a direct and proximate result of Lonestar's material breach of the Agreement, Allegiant has sustained damages in the amount of at least $1,678,390.94.  Allegiant is also entitled to recover pre-judgment interest, post-judgment interest, court costs, and attorneys' fees under Section 38.001 of the Texas Civil Practice & Remedies Code.

## COUNT TWO:  STATUTORY FRAUD

68.     Allegiant and Lonestar entered into a transaction involving real estate whereby Allegiant agreed to pay for the construction of the Facility at the South Terminal and Lonestar agreed to formally convey ownership of the Facility to Allegiant.

69.     Lonestar made a false representation of a past or existing material fact on February 5, 2021 when it's CEO Jeff Pearse sent Allegiant representatives a document by email containing a map of the South Terminal with yellow lines demarcating the boundaries of what Lonestar represented was its "Existing Leasehold Area."

70.     Lonestar made a false representation of a past or existing material fact on January 5, 2022 when its CEO Jeff Pearse emailed an Allegiant representative attaching a "brief [he] provided to [Allegiant] back in April 2021 regarding base facility development."  Pearse represented to Allegiant that "[s]ome minor changes have been made since then but the big picture elements remain."  The brief that Pearse attached to the email again showed the land where the Facility was built as being within Lonestar's "existing leasehold area."

71.     Lonestar made a false representation of a past or existing material fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement."

72.     Lonestar made a false representation of a past or existing material fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that, in the event of a condemnation, Allegiant would not be required to dismantle or dispose of the Facility.

73.     Lonestar CEO Jeff Pearse's representations were false when made because the area he repeatedly identified as being within Lonestar's "Existing Leasehold Area" was not and never was within Lonestar's leasehold.

74.     Lonestar CFO Brooke Bilger Dorrien's representations were false when made because Allegiant's Facility was not a building on a leasehold improvement and, in the event of condemnation, Lonestar would take the position that Allegiant (and not Lonestar) would be required to dismantle or dispose of the Facility.

75.     Lonestar had actual awareness and knew these representations were false when made.

76.     Lonestar's misrepresentations were material because Allegiant attached importance to where its Facility was going to be constructed.  Lonestar's misrepresentations induced Allegiant to agree to construct the Facility on the area located within the yellow lines.  Lonestar's continued misrepresentations induced Allegiant to enter the Construction Cost Recovery Agreement and subsequently pay Lonestar the full amount of reimbursement for construction costs relating to the Facility.

77.     Lonestar CEO Jeff Pearse's false representations of material fact were made to Allegiant for the purpose of inducing Allegiant to subsequently enter into the agreement to construct the Facility at that location and to reimburse Lonestar in full for the construction costs.

Lonestar had reason to expect that Allegiant would enter into the agreement in reliance on the representation.  Indeed, Lonestar made the false representations before Allegiant agreed to any binding contract relating to construction of the Facility and reimbursement for construction costs.

78.    Lonestar CFO Brooke Bilger Dorrien's representations of material fact were made to Allegiant for the purpose of inducing Allegiant to subsequently pay Lonestar the full amount of reimbursement for construction costs relating to the Facility.  Lonestar had reason to expect that Allegiant would pay the full costs in reliance on these representations.  Indeed, Lonestar CFO Brooke Bilger Dorrien made the representations in response to specific questioning from Allegiant representatives about the effect of paying for the reimbursement.

79.    Allegiant actually and justifiably relied on Lonestar's false representations by entering into the agreement to construct the Facility on the concrete slab that Lonestar represented was part of the "Existing Leasehold Area."  Allegiant further actually and justifiably relied on Lonestar's misrepresentation by entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

80.    As a direct and proximate result of Lonestar's false representations of past and existing material facts, Allegiant has sustained actual damages in an amount to be determined at trial.  Because Lonestar made the false representations with actual awareness of their falsity, Lonestar is liable to Allegiant for exemplary damages.

## COUNT THREE:  COMMON LAW FRAUD

81.    Lonestar made a representation of fact on February 5, 2021 when it's CEO Jeff Pearse sent Allegiant representatives a document by email containing a map of the South Terminal with yellow lines demarcating the boundaries of what Lonestar represented was its "Existing Leasehold Area."

82.     Lonestar made a representation of fact on January 5, 2022 when its CEO Jeff Pearse emailed an Allegiant representative attaching a "brief [he] provided to [Allegiant] back in April 2021 regarding base facility development."  Pearse represented to Allegiant that "[s]ome minor changes have been made since then but the big picture elements remain."  The brief that Pearse attached to the email again showed the land where the Facility was built as being within Lonestar's "existing leasehold area."

83.     Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement."

84.     Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that, in the event of a condemnation, Allegiant would not be required to dismantle or dispose of the Facility.

85.     Lonestar's misrepresentations were material because Allegiant attached importance to where its Facility was going to be constructed.  Lonestar's misrepresentations induced Allegiant to agree to construct the Facility on the concrete slab located within the yellow lines.  Lonestar's misrepresentations induced Allegiant to enter the Construction Cost Recovery Agreement and subsequently pay Lonestar the full amount of reimbursement for construction costs relating to the Facility.

86.     Lonestar CEO Jeff Pearse's representations were false when made because the area he repeatedly identified as being within Lonestar's "Existing Leasehold Area" was not and never was within Lonestar's leasehold.  Lonestar CFO Brooke Bilger Dorrien's representations were false when made because Allegiant's Facility was not a building on a leasehold improvement and, in the event of condemnation, Lonestar would take the position that Allegiant (and not Lonestar) would be required to dismantle or dispose of the Facility.

87.     Lonestar knew these representations were false when made and/or made the representations recklessly, as positive assertions, without knowledge of their truth.

88.     Lonestar intended that Allegiant act in reliance on the misrepresentations and had reason to expect that Allegiant would act in reliance on the representations.  Lonestar knew that Allegiant attached importance to where its Facility was going to be constructed.

89.     Allegiant actually and justifiably relied on the false representations by agreeing to construct the Facility on the concrete slab that Allegiant represented was part of the "Existing Leasehold Area."  Allegiant further actually and justifiably relied on the false representations by entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

90.     As a direct and proximate result of Lonestar's false representations of fact, Allegiant has sustained actual damages in an amount to be determined at trial and is also entitled to exemplary damages.  Allegiant is also entitled to a constructive trust on the proceeds that Lonestar obtained by fraud in the amount of at least $1,678,390.94.

## COUNT FOUR:  FRAUDULENT INDUCEMENT

91.     Lonestar made a representation of fact on February 5, 2021 when it's CEO Jeff Pearse sent Allegiant representatives a document by email containing a map of the South Terminal with yellow lines demarcating the boundaries of what Lonestar represented was its "Existing Leasehold Area."

92.     Lonestar made a representation of fact on January 5, 2022 when its CEO Jeff Pearse emailed an Allegiant representative attaching a "brief [he] provided to [Allegiant] back in April 2021 regarding base facility development."  Pearse represented to Allegiant that "[s]ome minor changes have been made since then but the big picture elements remain."  The brief that Pearse attached to the email again showed the land where the Facility was built as being within Lonestar's

"existing leasehold area."

93.     Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement."

94.     Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that, in the event of a condemnation, Allegiant would not be required to dismantle or dispose of the Facility.

95.     Lonestar's misrepresentations were material because Allegiant attached importance to where its Facility was going to be constructed.  Lonestar's misrepresentations induced Allegiant to agree to construct the Facility on the area located within the yellow lines.  Lonestar's misrepresentations induced Allegiant to enter the Construction Cost Recovery Agreement and subsequently pay Lonestar the full amount of reimbursement for construction costs relating to the Facility.

96.     Lonestar CEO Jeff Pearse's representations were false when made because the area he repeatedly identified as being within Lonestar's "Existing Leasehold Area" was not and never was within Lonestar's leasehold.  Lonestar CFO Brooke Bilger Dorrien's representations were false when made because Allegiant's Facility was not a building on a leasehold improvement and, in the event of condemnation, Lonestar would take the position that Allegiant (and not Lonestar) would be required to dismantle or dispose of the Facility.

97.     Lonestar knew these representations were false when made and/or made the representations recklessly, as positive assertions, without knowledge of their truth.

98.     Lonestar intended that Allegiant act in reliance on the misrepresentations and had reason to expect that Allegiant would act in reliance on the representations.  Lonestar knew that Allegiant attached importance to where its Facility was going to be constructed.

99.    Allegiant actually and justifiably relied on the false representations by entering into the agreement to construct the Facility on the area that Allegiant represented was part of the "Existing Leasehold Area."    Allegiant further actually and justifiably relied on the misrepresentations by entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

100.    As a direct and proximate result of Lonestar's false representations of fact, Allegiant has sustained actual damages in an amount to be determined at trial and is also entitled to exemplary damages.    Allegiant is also entitled to a constructive trust on the proceeds that Lonestar obtained by fraud in the amount of at least $1,678,390.94.

## COUNT FIVE:  FRAUD BY NON-DISCLOSURE

101.    Lonestar concealed and deliberately failed to disclose material facts when it entered into the License Agreement with the City on August 1, 2021 and refused to inform or disclose the effect of the License Agreement to Allegiant.

102.    Lonestar had a duty a duty to disclose the effect of the License Agreement to Allegiant because Lonestar previously represented to Allegiant that its Facility was being built upon the "Existing Leasehold Area."  Lonestar knew for a fact that its previous assertions were false and misleading.

103.    The concealed information, the effect of the License Agreement, was material because it purported to make the land upon which the Facility sat part of the Licensed Area from the City to Lonestar.  Allegiant attached importance to where its Facility was going to be constructed.  Lonestar's deliberate nondisclosure induced Allegiant to agree to construct the Facility on the concrete slab located within the yellow lines and represented to Allegiant as being part of the "Existing Leasehold Area."  Lonestar's deliberate nondisclosure induced Allegiant to enter the Construction Cost Recovery Agreement and subsequently pay Lonestar the full amount

of reimbursement for construction costs relating to the Facility.

104.    Lonestar knew for a fact that Allegiant was ignorant of the effect of the License Agreement because Lonestar itself represented to Allegiant that the area was within the "Existing Leasehold Area" and continued to do so even after entering the License Agreement.  Indeed, on March 30, 2022, Lonestar's CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement."

105.    Allegiant did not have an equal opportunity to discover the material facts because it was not a party to the License Agreement or the negotiations surrounding it.  Despite its duty to speak up and correct its prior misrepresentations to Allegiant and disclose the effect of the License Agreement, Lonestar was deliberately silent and refused to disclose the effect of the License Agreement to Allegiant.

106.    Lonestar intended that Allegiant rely on the nondisclosure or otherwise refrain from acting based on the nondisclosure because Lonestar wanted to induce Allegiant into agreeing to construct the Facility on the concrete slab identified by Lonestar as being part of the "Existing Leasehold Area."  Lonestar further wanted to induce Allegiant into entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

107.    Allegiant actually and justifiably relied on the nondisclosure by agreeing to construct the Facility on the concrete slab that Lonestar represented was part of the "Existing Leasehold Area."  Allegiant further actually and justifiably relied on the nondisclosure by entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

108.    As a direct and proximate result of Lonestar's fraudulent nondisclosure, Allegiant has sustained actual damages in an amount to be determined at trial and is also entitled to

exemplary damages.  Allegiant is also entitled to a constructive trust on the proceeds that Lonestar obtained by fraud in the amount of at least $1,678,390.94.

### COUNT SIX:  NEGLIGENT MISREPRESENTATION

109.    Lonestar made a representation of fact on February 5, 2021 when it's CEO Jeff Pearse sent Allegiant representatives a document by email containing a map of the South Terminal with yellow lines demarcating the boundaries of what Lonestar represented was its "Existing Leasehold Area."

110.    Lonestar made a representation of fact on January 5, 2022 when its CEO Jeff Pearse emailed an Allegiant representative attaching a "brief [he] provided to [Allegiant] back in April 2021 regarding base facility development."  Pearse represented to Allegiant that "[s]ome minor changes have been made since then but the big picture elements remain."  The brief that Pearse attached to the email again showed the land where the Facility was built as being within Lonestar's "existing leasehold area."

111.    Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that Allegiant's Facility "is technically a building on a leasehold improvement."

112.    Lonestar made a representation of fact on March 30, 2022 when its CFO Brooke Bilger Dorrien emailed Allegiant representatives that, in the event of a condemnation, Allegiant would not be required to dismantle or dispose of the Facility.

113.    These representations were made in the course of Lonestar's business as the landlord of the South Terminal and in a transaction in which Lonestar had a pecuniary interest because Allegiant was paying substantial Terminal Fees to Lonestar and further agreed to reimburse Lonestar for the entire costs of constructing the Facility.

114.    Lonestar CEO Jeff Pearse's representations were false when made because the area

he repeatedly identified as being within Lonestar's "Existing Leasehold Area" was not and never was within Lonestar's leasehold.  Lonestar CFO Brooke Bilger Dorrien's representations were false when made because Allegiant's Facility was not a building on a leasehold improvement and, in the event of condemnation, Lonestar would take the position that Allegiant (and not Lonestar) would be required to dismantle or dispose of the Facility.

115.    Lonestar's representations were supplied for the guidance of Allegiant in making its critical decision of where to construct the Facility at the South Terminal and whether or not to enter the Construction Cost Recovery Agreement and subsequently reimburse Lonestar for the construction costs relating to the Facility.

116.    Lonestar did not use reasonable care in obtaining or communicating the boundaries of its "Existing Leasehold Area" because Lonestar supplied false information to Allegiant.

117.    Allegiant actually and justifiably relied on the misrepresentations by agreeing to construct the Facility on the concrete slab that Lonestar represented was part of the "Existing Leasehold Area."  Allegiant further actually and justifiably relied on the misrepresentations by entering the Construction Cost Recovery Agreement and subsequently paying Lonestar the full amount of reimbursement for construction costs relating to the Facility.

118.    As a direct and proximate result of Lonestar's misrepresentations, Allegiant has sustained actual damages in an amount to be determined at trial and is also entitled to exemplary damages.

**COUNT SEVEN:  MONEY HAD AND RECEIVED**

119.    Lonestar collected money from Allegiant for the full costs of constructing the Facility when Lonestar knew that the City would argue that it would not have to compensate any party for the Facility since it sat on licensed land.

120.    Even worse, Lonestar actively misrepresented to Allegiant that the area the Facility

was built upon was part of its "Existing Leasehold Area" and failed to disclose the effect of the License Agreement to Allegiant.

121.    Accordingly, Lonestar holds money that belongs to Allegiant in equity and good conscience in the total amount of reimbursement that Allegiant paid to Lonestar relating to the Facility.

122.    As a direct and proximate result of Lonestar's wrongful conduct, Allegiant has sustained actual damages in an amount to be determined at trial.  Because Lonestar's actions were committed with fraud and/or malice, Allegiant is also entitled to recover exemplary damages.

**ATTORNEYS' FEES**

123.    Allegiant is entitled to its attorneys' fees, expert witness fees, costs for copies of depositions, and costs of court pursuant to Section 27.01 of the Texas Business and Commerce Code.  Allegiant is also entitled to its attorneys' fees under Section 38.001 of the Texas Civil Practice & Remedies Code.

**WHEREFORE,** Allegiant respectfully requests that, on final trial, the Court enter judgment for Allegiant against Lonestar and award the following relief: (i) actual, compensatory, consequential, and exemplary damages in an amount to be determined at trial; (ii) a constructive trust on the proceeds that Lonestar obtained by fraud in the amount of at least $1,678,390.94 plus a reasonable amount for attorneys' fees and exemplary damages; (iii) attorneys' fees, expert witness fees, costs for copies of depositions, and costs of court; (iv) pre-judgment interest and post-judgment interest at the highest lawful rates; and (v) such additional relief, at law and in equity, to which Allegiant may be justly entitled.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By:     /s/ R. Kent Love
_____

C. Mark Stratton
Texas Bar No. 19359200
R. Kent Love
Texas Bar No. 24102114
Janie Rowland
Texas Bar No. 24131634
300 West 6th Street, Suite 2050
Austin, Texas 78701
(512) 320-7200 (telephone)
(512) 320-7210 (facsimile)
strattonm@gtlaw.com
kent.love@gtlaw.com

-and-

Jacob D. Bundick *(Admitted Pro Hac Vice)*
Texas Bar No. 24045579
10845 Griffith Peak Drive, Suite 600
Las Vegas, Nevada  89135
(702) 792-3773 (telephone)
(702) 792-9002 (facsimile)
bundickj@gtlaw.com

*Attorneys for Allegiant Air, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 21, 2023, a true and correct copy of the foregoing was served, upon filing, via the Court's CM/ECF system upon all parties requesting electronic notification in this case.

/s/ R. Kent Love
_____

R. Kent Love